

**NUMBER 13-06-00398-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**JESUS TRANQUILINO CORTEZ, JR.**
**A/K/A JESUS CORTEZ, JR.,**                          **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                **Appellee.**

---

**On appeal from the 319th District Court of Nueces County, Texas.**

---

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Benavides**
**Memorandum Opinion by Chief Justice Valdez**

A jury convicted appellant, Jesus Tranquilino Cortez Jr., of three counts of murder, *see* TEX. PENAL CODE ANN. § 19.02 (Vernon 2003), and one count of aggravated assault with a deadly weapon, *see id.* § 22.02(a)(2) (Vernon Supp. 2007). Punishment was assessed at ninety-nine years for each murder offense and twenty years for the aggravated

assault offense, with the sentences set to run concurrently. Appellant asserts seven issues on appeal. We affirm.

## I. BACKGROUND

On May 15, 2005, a Ford F-150 ("F-150") slammed head-on into an Isuzu Rodeo ("Rodeo"). The Rodeo carried four occupants, three of whom died instantly. The sole survivor was Manuel Hernandez; the deceased were his wife and two daughters. Appellant was the sole occupant of the F-150. On August 4, 2005, the State indicted appellant on three counts of murder and one count of aggravated assault with a deadly weapon. Trial commenced on June 13, 2006.

### A. The State's Case

The State's first witness was Manuel Hernandez. Hernandez testified that he, his wife, and his two daughters were driving home after attending a graduation party. Hernandez occupied the front passenger seat; his wife and younger daughter were in the backseat, and his elder daughter was driving. Hernandez stated that they were "relaxing and just talking" when "out of the corner of his eye, [he] saw . . . two headlights right in front of [them]." Hernandez stated that he was unsure if he "blacked out," but that he could remember hearing the "hissing noise of the motor." Although in pain, Hernandez managed to pull himself outside of the vehicle through the passenger side window. By this time, other people had arrived and were attempting to assist him and his daughters. Emergency personnel arrived shortly thereafter.

In testifying about his injuries, Hernandez stated that he suffered a cut over his nose, several broken bones around his left eye, puncture holes on his left shin and elbow,

2

and a dislocated knee, which required knee-reconstructive surgery. Hernandez also stated that at no point did he ever see or feel his daughter drive out of her driving lane, and that the last thing he saw was the truck's headlights coming right at them.

The State also called Jesus Cortez, Sr., appellant's father, to the witness stand. Cortez first testified that on the day in question, he called appellant at 6:39 p.m. and inquired into his whereabouts. According to Cortez, appellant replied that he had taken Cortez's's truck in order to get something to eat. Cortez added that approximately three or four minutes later, he received a phone call from someone telling him that appellant had been involved in an accident. Cortez also acknowledged that appellant had been involved in a relationship with a girl named C.S.

On cross-examination, Cortez described the road where the accident took place as a "two-way" road with "nothing marking the center line of the road." According to Cortez, the road had been under construction for approximately a year and a half and was still under construction at the time of the accident. Cortez also acknowledged that at no time had he known appellant to try to harm himself in any way. Cortez finally stated that when he talked to appellant at 6:39 p.m., he did not sound depressed or despondent.

The State also presented the testimony of Jacquelin Garcia, Kathleen Westfall, and Ricardo Ramon. Garcia testified that on the day in question, at approximately 6:30 p.m., she was traveling north on FM 1889 towards Calallen, Texas, when she saw a red vehicle being passed by a truck traveling south at a high rate of speed. According to Garcia, the truck had more than sufficient time to pass the red car and move back into the proper lane. However, Garcia stated that the truck kept traveling directly towards her, that she began honking, and that she was forced to swerve to her right onto some gravel. Garcia added

3

that the truck missed hitting her by approximately half a car length, that she was scared, was shaking, and when she got home, she could barely stand because her legs were shaking so much. Garcia further stated that based on her observations, it appeared that the truck was traveling towards her in a purposeful manner. Finally, Garcia testified that when she saw on the news that an accident had occurred on FM 1889, she recognized the truck as the same truck that had almost hit her.

On cross-examination, Garcia testified that she could not recall whether the road was under construction at that time, but she acknowledged that the road was only "two-lanes wide" and that there were no shoulder lanes on either side.

Kathleen Westfall testified to a similar account. According to Westfall, she and her boyfriend, Ricardo Ramon, were traveling south on FM 1889 when she saw a grey F-150, traveling north, right in front of them. According to Westfall, the F-150 was only a couple of car lengths away when it forced them to pull off to the side of the road. Westfall added that the F-150 neither slowed down or took any sort of evasive action as it approached them.

Ricardo Ramon testified to the same incident. Ramon added, however, that he first saw the F-150 when it attempted to pass another vehicle that was traveling in their direction. Ramon stated that it seemed like the driver of the truck saw them because it swerved back behind the vehicle it attempted to pass. According to Ramon, as he got to within 30 or 40 feet of the oncoming vehicle, the F-150 again pulled into his lane causing him to swerve to his right onto some gravel. Ramon stated that had he not swerved, the truck would have hit them head-on, and that he felt the whole incident could have been avoided if the truck had simply waited to pass the vehicle. Ramon further testified that he

4

later heard that a major accident had occurred on FM 1889 and that a truck fitting the description of the F-150 that almost hit him was involved. He finally testified that he recognized appellant as the person who was driving the F-150.

The State also called State Troopers Manuel Castro Jr. and Cesar Villarreal Jr. Trooper Castro testified that he was notified of an accident involving a truck and a SUV at approximately 7:00 p.m. He arrived at the scene minutes later. Testifying from a scaled diagram of the collision that was admitted as evidence, Castro stated that he first observed "shadow skid marks" that emanated from the Rodeo, which, according to Castro, meant that an attempt to apply the brakes was made before impact. Castro added, however, that no such skid marks were created by the F-150, and that the only skid mark left by the truck was a "post-accident" "thick black tire mark." Castro also stated that the area where the collision occurred was a "well-marked construction zone" with "nothing . . . in the road way to make someone . . . take evasive action and get out the way." Castro placed the time of the accident at 6:48 p.m., and noted that the truck's speedometer was locked at 76 miles per hour. Castro concluded that the collision occurred because appellant was driving on the wrong side of the roadway and again noted that there was no indication that appellant ever applied the F-150's brakes before collision.

Trooper Villarreal, a "level 6" accident reconstructionist and forensic-mapping specialist, testified as an expert witness for the State. Villarreal first noted that he created the diagram of the collision that had been previously introduced into evidence. Testifying from the diagram, Villarreal stated he first observed the "shadow skid marks" left by the Isuzu Rodeo, which meant that there was, at the very least, "initial hard braking." Villarreal also noted that there was no indication that the F-150 ever attempted to apply its brakes,

5

nor was there any evidence that appellant took any sort of evasive action to avoid the collision. Villarreal added that if appellant had taken evasive action he would have expected to see "yaw marks"on the road.[1]

Forensic Pathologist, Ray Fernandez, M.D., next testified on the State's behalf. According to Dr. Fernandez, the deceased persons suffered various severe injuries, ranging from multiple abrasions; skeletal fractures, such as cervical spine, spinal column and skull fractures; and internal bleeding. Dr. Fernandez concluded that the cause of death for each victim was multiple blunt-force injuries.

The State's final witness was C.S. C.S. testified that she dated appellant for a month and a half. She remembered that, while they were dating, appellant would occasionally comment that he "wished he wasn't alive." C.S. stated that she broke up with appellant approximately one week before the collision, that he became "sad" after the break-up, and that each time appellant would call her, he would tell her that he wanted her back. On the day of the collision, C.S. testified that she received two phone calls from appellant, one at 6:27 p.m. and the second at 6:47 p.m. According to C.S., the first phone call lasted approximately three minutes, and appellant had merely inquired what she had done that day. She stated that he sounded normal. C.S. stated, however, that when she received the second phone call, appellant sounded angry, that he said that "[this] was going to [be] the last time [she] talked to him," and then simply hung up. C.S. stated that

---

[1] Trooper Villarreal described a "yaw mark" as

"a tire mark left by a rolling tire. If you're driving down the roadway and you turn the vehicle pretty sharp, your tire is going to continue to roll. However, you're going to see a wider skid mark that starts thin, goes wide, then goes back thin again. This skid mark is characterized by striations. That's basically–striations are caused by the grooves of the tire. You expect to see that, a loop going . . . back into his lane of travel, the F-150's."

6

she did not get a chance to talk to him or ask what he meant by that comment. C.S. also acknowledged that appellant was involved in the collision shortly after the second phone call.

On cross-examination, C.S. testified that she had never known appellant to try to harm himself and that she didn't believe that appellant was going to harm himself even after she received the second phone call.

## B. The Defense's Case

Appellant's first witness was Robstown High School principal, Roel Lara. Lara testified that while appellant was attending high school, he never knew appellant to be suicidal or mentally unstable.

John Orobio, appellant's cousin, next testified on appellant's behalf. According to Orobio, three days after the collision took place, he drove to the impound lot where the F-150 was located and took various pictures of the vehicle. Two particular pictures taken by Orobio showed appellant's right tennis shoe lodged between the vehicle's brake pedal and the bottom portion of the dashboard.

On cross-examination, Orobio stated that he went to the impound lot with the intent to take pictures of the vehicle. Orobio also acknowledged that it may have been possible that the truck was tampered with between the time of the wreck and the time that he took the pictures at the impound lot.

Appellant's next witness was Ezequiel Rodriguez, mental health coordinator for the Nueces County Sheriff's Department. Rodriguez first described the procedures used by prison officials to determine whether a prisoner is mentally unstable or suicidal. According to Rodriguez, appellant never showed any signs that he was suicidal. On cross-

7

examination, Rodriguez acknowledged that "no system is perfect," and stated that it is possible for a prisoner to pass the initial mental health screen but later commit suicide.

Adolfo Lopez, a friend of appellant's family, testified that moments before the collision occurred, as he was driving north on FM 1889, he saw appellant driving the F-150. Lopez testified that he waved at appellant and that appellant waved back with a smile on his face.

### C. The State's Rebuttal

After the defense rested, the State called Trooper Castro as a rebuttal witness. Trooper Castro testified that he thoroughly examined the inside and outside of the F-150 and did not see anything that looked like a red tennis shoe. Trooper Castro was also shown photographs of the F-150 that were taken at the scene of the collision and compared them to the photographs that were taken by Orobio three days later at the impound lot. Trooper Castro noted that the inside of the truck was not the same, and that usually after an investigation of a car accident is completed, the common practice is to pick up any debris at the scene and place it in the vehicles. On cross-examination, Trooper Castro stated that he had no evidence that the shoe was intentionally placed on the brake pedal and also noted that a shoe lodged between a brake pedal and a dashboard is not indicative of a person attempting to apply the brakes.

### II. Legal and Factual Sufficiency

By his first and second issues, appellant contends the evidence is legally and factually insufficient to support his murder and aggravated assault convictions.

### A. Standards of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact-finder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hopper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). We must presume that the fact-finder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact-finder's

9

determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the fact-finder's determination is manifestly unjust. *Watson*, 204 S.W.4d at 414-15; *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict. *Watson*, 204 S.W.3d at 417.

### B. Legally and Factually Sufficient Evidence of Murder

A person commits murder if he (1) intends to cause serious bodily injury and (2) commits an act clearly dangerous to human life that (3) causes the death of an individual. TEX. PENAL CODE ANN § 19.02(b)(2). Intent to kill is not required to commit murder under section 19.02(b)(2). *Ramirez v. State*, 229 S.W.3d 725, 729 (Tex. App.–San Antonio 2007, no pet.). Rather, there must be an intent to cause serious bodily injury to the individual whose death results from an act clearly dangerous to human life. *Id.*; *see also Ortiz v. State*, 651 S.W.2d 764 (Tex. Crim. App. 1983). Here, the State's indictment alleged that appellant, with the intent to cause serious bodily injury to himself, drove a motor vehicle on the wrong side of the roadway, causing a collision that was clearly dangerous to human life, that caused the deaths of Josefina, Maricella, and Melinda Hernandez.

Appellant's argument challenging the sufficiency of the evidence to support his murder conviction is limited to whether he had the requisite intent to cause serious bodily injury to himself and, in turn, intentionally caused the collision.

In his brief, appellant contends the following evidence negates any intent on his part

to harm himself: (1) C.S. testified that she did not believe appellant was going to harm himself even after she received the second phone call from appellant; (2) Adolfo Lopez testified that he saw appellant wave at him and smile moments before the collision occurred; and (3) once appellant was pulled out of the truck, his first question was "what did I hit?"

The following evidence, however, pointed towards appellant's intent to harm himself: (1) at approximately 6:10 p.m., Kathleen Westfall and Ricardo Ramon saw appellant pull into their lane and force them off the road; (2) at approximately 6:30 p.m., Jacquelin Garcia saw appellant's truck coming directly towards her and was also forced off the road; (3) Westfall, Ramon, and Garcia each testified that they believed that appellant drove towards them in a purposeful manner and that if they had not pulled off to the side of the road, they would have been hit head-on by appellant; (4) C.S. testified that she dated appellant for a month and a half and that, during their relationship she would on occasion hear appellant say that "he wished he wasn't alive;" (5) C.S. broke up with appellant one week before the accident; (6) at 6:47 p.m., C.S. received a phone call from appellant wherein he stated that "it was going to [be] the last time [she] talked to him;" (7) appellant hit the Hernandez's vehicle head-on at 6:48 p.m.; and (8) the investigation of the collision showed that at no point did appellant apply the F-150's brakes, nor were there any signs that appellant took evasive action to avoid the collision.

Intent is a question of fact and, therefore, within the sole purview of the jury, for which the jury may rely on its collective common sense and apply common knowledge and experience. *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003); *Ramirez v. State*, 229 S.W.3d 725, 729 (Tex. App.–San Antonio 2007, no pet.). Additionally, intent

11

may be inferred from the circumstantial evidence surrounding the incident including the acts, words, and conduct of the accused. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995); *Ramirez*, 229 S.W.3d at 729. Assuming, without deciding, that the evidence appellant points to lends support to his argument that he never intended to hurt himself, that, as noted above, was not the only evidence that the jury heard. Due deference must be accorded to the jury regarding the weight and credibility of the evidence. *See Jones v. State*, 944 S.W.2d 642, 649 (Tex. Crim. App. 1996). Because there was some evidence to support the jury's finding that appellant had the required mental state, we conclude that the evidence was legally sufficient to support the conviction under section 19.02(b)(2). *Jackson*, 443 U.S. at 319; *Jones*, 944 S.W.2d at 649; *see also Ramirez*, 229 S.W.3d at 730. Further, viewing all the evidence in a neutral light, favoring neither party, we hold that the evidence is factually sufficient to support appellant's murder conviction. *See Watson*, 204 S.W.3d at 414. Appellant's first issue is overruled.

### C. Aggravated Assault

Appellant also contends the evidence is legally and factually insufficient to prove his aggravated assault conviction.

A person commits an assault if the person "intentionally, knowingly, or recklessly causes bodily injury to another." TEX. PENAL CODE ANN. § 22.01(a)(1) (Vernon Supp. 2007). To prove aggravated assault, the State must prove that the actor committed an assault as defined in section 22.01 and the person (1) caused serious bodily injury to another, including the person's spouse; or (2) used or exhibited a deadly weapon during the commission of the assault. *Id*. § 22.02(a) (Vernon Supp. 2007). Here, the State alleged

12

that appellant used a deadly weapon during the commission of his assault. As such, the State was required only to prove that Hernandez sustained "bodily injury" as opposed to "serious bodily injury." *See id*. § 22.02(a)(2).

"Bodily injury" means "physical pain, illness, or any impairment of physical condition." *Id*. § 1.07(a)(8) (Vernon Supp. 2007). "This definition appears to be purposefully broad and seems to encompass even relatively minor physical contacts so long as they constitute more than mere offensive touching." *Lane v. State*, 763 S.W.2d 785, 786 (Tex. Crim. App. 1989).

Appellant contends that the evidence is insufficient to prove that Manuel Hernandez sustained bodily injury because, at trial, the State introduced into evidence medical records that belonged to someone other than Manuel Hernandez. Nonetheless, the State also elicited testimony from Manuel Hernandez. Hernandez testified that he suffered a cut over his nose, several broken bones around his left eye, puncture holes on his left shin and elbow, a dislocated knee, and permanent disfiguring scars. Hernandez further testified that he was in the hospital for eight days and walks with a limp because of his knee injury. We find that Hernandez supplied sufficient testimony to prove that he sustained bodily injury as a result of the collision. *See Allen v. State*, 533 S.W.2d 352, 354 (Tex. Crim. App. 1976) (recognizing that testimony from the victim that she suffered physical pain is generally sufficient to prove bodily injury); *Letson v. State*, 805 S.W.2d 801, 806-07 (Tex. App.–Houston [14th. Dist.] 1990, no pet.) (same). We conclude that the evidence is legally and factually sufficient to support appellant's aggravated assault conviction. *See Jackson*, 443 U.S. at 319; *Watson*, 204 S.W.3d at 414. Appellant's second issue is overruled.

13

### III. LESSER-INCLUDED OFFENSE

By his third issue, appellant contends that the trial court erred in refusing to charge the jury on the lesser-included offense of assault.

A defendant is entitled to an instruction on a lesser-included offense if (1) the lesser offense is a lesser-included offense of the charged offense, and (2) there is some evidence in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser offense. *Guzman v. State*, 188 S.W.3d 185, 188 (Tex. Crim. App. 2006).

Under prong one, we compare the elements of the charged offense, as modified by the indictment, with elements of the lesser offense that might be added to the jury charge. *Id*. "We compare the elements of both offenses to determine whether, in proving the offense as charged, the State necessarily had to prove all the elements of the lesser offense, plus something more." *Id*. at 189 & n.7 (applying article 37.09 of the Texas Code of Criminal Procedure). If prong one is met, we then consider, under prong two, whether there is some evidence from which a jury rationally could find that, if the defendant is guilty, he is guilty only of the lesser offense. *Id*. At this step of the analysis, "the evidence must establish the lesser-included offense as a valid, rational alternative to the charged offense." *Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007).

Here, the parties agree that under the circumstances of this case, assault was a lesser-included offense of aggravated assault. The key distinction between the two offenses, as raised by appellant, is that the aggravated assault charge required the State to show that appellant used a deadly weapon during the commission of the assault,

14

whereas the simple assault charge did not. *See* Tex. Penal Code Ann. §§ 22.01(a)(2), 22.02(a)(2), 22.02(b)(2). Accordingly, in order for appellant to have been entitled to the simple assault charge, there must have been some evidence presented that would have permitted a rational jury to find that appellant did not use a deadly weapon in committing the assault. More specifically, there must be some evidence upon which the jury could have determined that appellant did not use his vehicle in a manner capable of causing death or serious bodily injury. *See Garcia v. State* 92, S.W.3d 574, 576 (Tex. App.–Austin 2002, no pet.) ("To be entitled to an instruction on simple assault, it was necessary that there be some evidence that would rationally warrant the jury in finding that the appellant did not use his truck as a deadly weapon. It is not enough that the jury might simply disbelieve crucial evidence; there must be some evidence that the truck was not a deadly weapon in the manner of its use.").

In his brief, appellant argues that "the jury could have found him guilty of assault causing bodily injury if the jury did not believe that the vehicle was intentionally used a deadly weapon to harm himself." First, we note that an intent to achieve a specific purpose is not necessary to support a finding that an object was a deadly weapon in the manner of its use. *See id.* at 575-576. Instead, we look to the manner in which an object is actually used. *Id*. We have already determined that sufficient evidence exists to support a finding that appellant intentionally drove the F-150 into the Hernandez vehicle. As such, we further conclude that there is no evidence that would rationally support a finding that appellant assaulted Hernandez but did not use a deadly weapon in doing so. Appellant's third issue is overruled.

15

## IV. ADMISSION OF PHOTOGRAPHS

By his fourth issue, appellant complains the trial court abused its discretion in admitting nine autopsy/crime scene photographs of the deceased, exhibits 15, 16, 17, in violation of Texas Rules of Evidence 401 and 403. Specifically, appellant argues that the photographs "were not material to any issue in the case" and were "highly inflammatory."

The admissibility of a photograph is within the sound discretion of the trial judge. *Shuffield v. State*, 189 S.W.3d 782, 786 (Tex. Crim. App. 2006). A photograph is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401. Here, the photographs depicted the victim's bodies at the scene of the collision and as they were received at the morgue. The State offered the photographs during the testimony of medical examiner Dr. Ray Fernandez, and as the photographs were shown to Dr. Fernandez, the State inquired whether the victim depicted was the person he performed the autopsy on. The photographs were therefore utilized to identify the state of the victims' bodies prior to the autopsy. We find that the photographs were relevant during the guilt phase of trial. *See Shuffield*, 189 S.W.3d at 787 (photographs showing location of body, crime scene, and wounds that caused victim's death were relevant, even though issue of cause of death was presented by other evidence and was not in dispute).

Even relevant evidence, however, may be excluded if its probative value is substantially outweighed by its prejudicial effect. TEX. R. EVID. 403. Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be

16

more probative than prejudicial. *Id.* at 787. A rule 403 analysis should include, but is not limited to, (1) how probative the evidence is; (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence. *Id.* In the context of the trial court's admitting photographs, we consider the number and size of the photographs, whether they are in color or black and white, whether they are gruesome, whether the body is naked or clothed, and whether the body has been altered by autopsy. *Id.*; *Frank v. State*, 183 S.W.3d 63, 77 (Tex. App.–Fort Worth 2005, pet. ref'd).

Exhibits 15, 16, and 17 contain a set of three photographs per exhibit. Each set contains a photograph of a victim at the scene of the accident, and two photographs of the same victims' body as it was received by the Nueces County Medical Examiner. Each set depicts a different victim. The photographs show the victims from their waist up, with their bodies situated on top of "body bags." Only minor injuries are apparent, and as the photos were taken before the autopsy, no alterations are shown. The photographs are probative in that they were utilized for identification purposes, and, without question, aided the jury's understanding of the reality and general nature of the crime.

Turning to the other relevant factors, all nine photographs at issue are roughly three by three and a half inches or smaller, were presumably in color, and were not especially gruesome. None depict any mutilation caused by an autopsy and each photograph depicts the victim fully clothed. Lastly, we note that the State utilized little time to develop the evidence. After considering the appropriate factors, we conclude the trial court did not abuse its discretion in finding the relevance of the photographs was not substantially outweighed by the danger of unfair prejudice. *See Sierra v. State*, 157 S.W.3d 52, 62

17

(Tex. App.–Fort Worth 2004), *aff'd*, 218 S.W.3d 85 (Tex. Crim. App. 2007). Appellant's fourth issue is overruled.

## V. JURY INSTRUCTION

By his fifth issue, appellant argues that the trial court's instruction to the jury, that appellant's sentences would run concurrently, constitutes reversible error. The trial court, however, does not err in giving such an instruction. *McGowan v. State*, 664 S.W.2d 355, 358-59 (Tex. Crim. App. 1984); *Haliburton v. State*, 578 S.W.2d 726 (Tex. Crim. App. [Panel Op.] 1979); *Strong v. State*, 138 S.W.3d 546, 557 (Tex. App.–Corpus Christi 2004, no pet.). Appellant urges us to depart from *Haliburton*; we again decline to do so. *See Strong* 138 S.W.3d at 557. Appellant's fifth issue is overruled

## VI. INEFFECTIVE ASSISTANCE OF COUNSEL

By his sixth and seventh issues, appellant argues that his trial counsel was ineffective because he failed to call "invaluable" witnesses to mitigate punishment, and because he rejected a plea bargain proposed by the State without adequately explaining the offer and its consequences to appellant.

### A. Standard of Review

To prevail on a claim of ineffective assistance of counsel, appellant must prove by a preponderance of the evidence that: (1) counsel's performance fell below the standard of prevailing professional norms; and (2) there is a reasonable probability that, but for counsel's deficiency, the result of the trial could have been different. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). A reasonable probability is one sufficient to undermine confidence in the

18

outcome of the proceedings. *Thompson*, 9 S.W.3d at 812. Allegations of ineffective assistance of counsel must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Id*. at 813.

Moreover, an appellate court's review of the defense counsel's representation is highly deferential, and we presume that counsel's action fell within the wide range of reasonable and professional assistance. *Ex parte Chandler*, 182 S.W.3d 350, 354 (Tex. Crim. App. 2005); *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002).

### B. Mitigation

By his sixth issue, appellant argues that trial counsel failed to present mitigating evidence at the punishment stage of trial. Appellant points to various affidavits attached to his motion for new trial, wherein three Robstown police officers, a teacher, and a school administrator indicated their willingness to testify to appellant's character. Each affidavit contains a general statement that appellant was a good, respectful, young man; who only began to change after his parents divorce, when he started to hang out with the wrong crowd and got involved with drugs.

A claim for ineffective assistance of counsel may not be predicated upon a failure to call witnesses unless appellant shows that such witnesses were available and that their testimony would have benefited the appellant. *See King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983). Additionally, proffered evidence must be more than cumulative of other evidence at trial to raise a specter of ineffective assistance. *Holland v. State*, 761 S.W.2d 307, 319 (Tex. Crim. App. 1988); *Ketchum v. State*, 199 S.W.3d 581, 597 (Tex. App.–Corpus Christi 2006, pet. ref'd).

At the punishment hearing, appellant called his mother, Ida Cortez, and aunt, Maria Orobio, to testify on his behalf. Each witness testified to appellant's character, noting that appellant had changed since his parents' divorce, that they saw a change in the friends he chose to hang out with, and that he was a different person when he used drugs. Ida Cortez detailed the problems appellant had with drugs and school, and she stated that she raised him in a "good, respectful, manner." Under *Holland*, proffered testimony must be more than cumulative of other testimony at trial. *Holland*, 761 S.W.2d at 319. Here, the proffered testimony provided in each affidavit was clearly cumulative of comparable testimony provided by appellant's aunt and mother. Appellant's sixth issue is overruled.

### C. Plea Bargain

By his seventh issue, appellant argues that his trial counsel failed to advise him adequately on accepting the State's plea bargain offer. Appellant argues that "counsel's failure to fully explain the offer effectively denied appellant the opportunity to make an informed decision about whether to accept or reject the offer."

Generally, the record on direct appeal is not sufficient to show trial counsel's tactical or strategic reasons for his trial decisions; thus it is usually insufficient to overcome the presumption of reasonable and professional conduct. *See Bone*, 77 S.W.3d at 833. It is incumbent on appellant to present a record on appeal that shows a lack of plausible trial strategy. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). In the face of a record silent as to counsel's trial strategy, an appellate court should not speculate about counsel's tactics or reasons for taking or not taking certain actions. *See Bone*, 77 S.W.3d at 833-35.

20

First, we note that appellant failed to allege that his trial attorney was ineffective with regard to the plea offer in his motion for new trial. Second, the record does not reflect trial counsel's reasoning behind his tactical or strategic decisions, and we may not speculate that no plausible professional reasons exist. *See id*. at 836. Because defense counsel has not been given an opportunity to explain his actions, he may not, on this record, be condemned as unprofessional and incompetent. *See id*.

We conclude appellant has failed to present a sufficient record to rebut the presumption of reasonable and professional conduct by trial counsel. *See Scheanette v. State*, 144 S.W.3d 503, 510 (Tex. Crim. App. 2004) (rejecting ineffective assistance claim for insufficient record). We overrule appellant's seventh and final issue.

## VII. CONCLUSION

We affirm the trial court's judgment.

ROGELIO VALDEZ
Chief Justice

Do not publish. TEX. R. APP. P. 47.2(b).
Memorandum Opinion delivered and filed
this the 27th day of August, 2008.